## McIntyre v. Chappell.

Circumstances under which the heir may maintain an action for the personal property of the
ancestor, without claiming through administration. This case distinguished from the
case of Moore against Morse. (2 Tex. R., 400.) (Note 39.)

Where the place of domicile of both the parties is the same as that of the celebration of the
marriage, the laws of that place control the disposition of personal property possessed by
the parties at the time of the marriage or acquired by them subsequent thereto and be-
fore a change of domicile. (Note 40.)

Although actual residence is not indispensable to retain a domicile once acquired, but it is
retained by the mere intention not to change it nor to adopt another, yet the act and the
intention must concur to enable a party to acquire a domicile; and the original domicile
is not gone until a new one has been actually acquired *animo et facto.* (Note 41.)

*It seems* that where the domicile of the husband is different from that of the wife at the time
of the marriage, and the place of the celebration of the marriage concurs with the hus-
band's domicile that will be the matrimonial domicile.

The community does not embrace property received by either husband or wife in payment
of money due to them in their separate right, nor does it embrace the increase of slaves
owned by either party at the time of marriage or acquired afterwards in his or her in-
dividual right. (Note 42.)

Appeal from Washington. This suit was brought in October, 1846, by the
appellant, as guardian of Sarah James McIntyre, minor heir of James McIn-
tyre, deceased, to recover of the appellee certain slaves.

The defendant answered that the slaves in controversy were not the property
of the ward of the plaintiff, as alleged in the petition, but of Harriet C. Chap-
pell, the wife of the defendant, in whose right he claimed to be lawfully pos-
sessed; and further, that the slaves in controversy belonged to the estate of
James McIntyre, deceased, upon which there had been no administration; con-
cluding with a general denial.

The material facts proved were that James McIntyre, the intestate, and
father of the minor, Sarah James, married her mother, Harriet C., the wife of
the defendant, in Tennessee, on the 1st day of January, 1840; that said James
McIntyre and his wife, Harriet C., previous to and at the time of their [188] mar-
riage, resided in the State of Tennessee, he with the family of his mother, and
she with that of her mother; that previous to and at the time of their marriage
they had formed and entertained the intention of removing to Texas; that
about two weeks after their marriage the husband left Tennessee and came to
this country, leaving his wife with their relatives in Tennessee; that he arrived
in Washington county, in this State, in March, 1840, bringing with him some
negroes; that he improved land, planted a crop, and after about three months
returned to Tennessee, where he remained until the following spring, 1841;
that in March, 1841, he removed to this country with his wife, and resided upon
the place which he had previously improved in Washington county until his
death in 1842. It was in proof that at the time of their marriage James McIn-
tyre owned lands and slaves, and the wife also owned slaves and other property
in Tennessee; that the land of the husband and the slaves of the wife were
sold in that State in December, 1840. The slaves in controversy are Eliza, a
woman and her infant child, Joseph, a man, Jefferson, a man, and Elvira, a
girl. It is in proof that Jefferson belonged to James McIntyre previous to the
marriage. Eliza and Joseph were received in payment for his land sold in
Tennessee, which also had belonged to him previous to his marriage. Elvira
was born in this country after his removal, and is the child of a woman named
Julia, who also was his property previous to his marriage.

It was in proof that the common law is the rule of decision in Tennessee,
and that by the law of that State at the time, upon the marriage the personal
property of the wife became the property of the husband. It is also in proof
that the plaintiff was duly appointed guardian of the minor, Sarah James McIn-
tyre, who was the only child and heir of the deceased, James McIntyre, in
October, 1844; that Harriet C. Chappell, wife of the defendant, was, at
the time of her intermarriage with the defendant, the widow of the said
James McIntyre, deceased. It appears from the record of certain [189] pro-

## McIntyre v. Chappell.

ceedings had in the Probate Court, made a part of the statement of facts by agreement of parties, that by an order of the Probate Court in an amicable proceeding there instituted for that purpose partition was made of the effects of the deceased, James McIntyre, between the wife of the defendant and her daughter, the infant heir; and that afterwards, in September, 1846, at the instance of the plaintiff as guardian of the heir, the proceedings in the partition were set aside and annulled as to the slaves now in controversy; that thereupon a controversy arose between the guardian of the heir, the present plaintiff, and the present defendant, as to the ownership of these slaves—the former claiming them as the sole property of his ward, by inheritance from her father, James McIntyre, and the latter contending that they were community property, and subject to be equally divided between the wife of the defendant, as the surviving partner, and the heir of James McIntyre.

The plaintiff requested the court to instruct the jury—

"1st. That if they believed from the evidence that the father of the said Sarah and the wife of the defendant were married in the State of Tennessee, then all the personal property of the wife became the property of the husband as soon as he reduced the same to possession.

"2d. That if the jury believed from the evidence that the property sued for was the property of the father of said minor at the time of his marriage, or was purchased with other property which was his before his marriage with his wife, (the wife of the present defendant,) they must find for the plaintiff.

"3d. That if the property of Harriet C. Chappell for a single moment of time was vested in James McIntyre, in Tennessee, the same by the laws of Texas could not be taken from him and given to H. C. Chappell."

The second instruction was given as asked. The first and third were given with this addition or qualification: "That if the jury believed that the parties intended to remove to [190] Texas at the time of their marriage, and immediately did remove to Texas, their respective rights must be determined according to the laws of Texas." The jury returned a verdict for the defendant. The plaintiff moved for a new trial, which was refused; there was judgment for the defendant; and the plaintiff appealed.

*Lewis* and *Rivers*, for appellant.

I. The property in controversy consists alone of negroes that belonged to the husband at the time of the marriage or were purchased after the marriage with the proceeds of his paternal estate. Therefore, whether the laws of Texas or Tennessee are to govern, the right is in the child of the deceased. (Laws, vol. 4, p. 6; Civil Code of La., art. 2370.)

II. The domicile of both the parties was the State of Tennessee. The celebration of the marriage was there. All the property they had at that time and all they acquired before they left that State must be governed by her laws. (Laws, vol. 4, p. 6; Saul v. His Creditors, 17 Mart. R., 605, 3 La. Con. R., 663; Boucier v. Lanussee, 3 Mart. R., 581, 1 La. Con. R., 174; Gale v. Davis's Heirs, 4 Mart. R., 645, 1 La. Con. R., 312; Le Breton v. Nouchet, 3 Mart., 60–73, 1 La. Con. R., 93; Cole's Widow v. His Executors, 4 La. Con. R., 146; Murphy v. Murphy, 5 Mart. R., 83; Partida, 4-18-24, note by Gregory Lopez; Story Conf. L., sec. 192; Id., sec. 187; Id., sec. 185; Ford v. Ford, 2 La. Con. R., 746.)

III. The intention of a change of domicile could not affect the question. (Story Con. L., secs. 148, 157, 174, 190; Saul v. His Creditors, 17 Mart. R., 599.) It is only where the parties are abroad or *in transitu* that the law of the intended domicile applies. (Story Con. L., secs. 192 to 199, and the Louisiana decisions referred to.) It may be doubted whether a positive agreement that their property should be distributed according to the laws of their intended domicile could have been enforced. (Boucier v. Lanussee, 3 Mart. R., 581; Story Con. L., sec. 179.)

McIntyre v. Chappell.

*Shepard*, for appellee.

I. With regard to the point as to the law which governed the marriage, the court is referred to Story Con. L., title, MARRIAGE AND ITS INCIDENTS. (Robinson *v.* Bland, 2 Burr. R., 1077; 3 Wheat. R., 101; 4 Cow. R., 513; 2 Kent Com., 459; Ferguson on Marriage and Divorce, 339, 341, 342, 346, 395, 396, 416.)

II. But the record presents another question which it seems to us must control the case, viz, that the plaintiff cannot sue for property belonging to the succession of James McIntyre until after distribution. (Moore *v.* Morse, 2 Tex. R., 400; 2 U. S. Dig., 336, secs. 127–132; 10 Pick. R., 463; 9 Mass. R., 337; 1 McCord R., 132; Id., 371; Cooke R., 200; 12 Mass. R., 319; 3 Id., 514; 6 Id., 149; 2 Pet. Dig., 108, secs. 15, 35; 2 U. S. Dig., 489. secs. 17, 23, 24, 67, 68, 73, 74; 1 A. K. Marsh. R., 10; 23 Pick. R., 128; 2 Brevard R., 307.)

*Gillespie*, same side. There was no error in the charge of the judge. (Le Breton *v.* Nouchet, 1 La. Con. R., 93; Ford's Curator *v.* Ford, 2 Id., 744; Story Con. L., 286, secs. 180–199.) The common law carries out the intention of the parties and executes the contract according to the place of execution intended by the parties. (2 Burr. R., 1078; 3 Dal. R., 374; 4 Cow. R., 513; 2 Kent Com., 459.)

II. The appellant had no right to bring this suit. (Moore *v.* Morse, 2 Tex. R., 400.)

III. All property purchased during the marriage belongs to the community; it matters not where the funds come from. (Benj. & Slidel.)

WHEELER, J. It is objected that the plaintiff, as guardian of the heir, cannot maintain this action, and that it can alone be maintained by the administrator. In support of this objection we are referred to the decision of this court in the case of Moore *v.* Morse, (2 Tex. R., 400.) That case, however, [**192**] was essentially different in its facts and principle from the present. The plaintiff there claimed as the legatee of one Galpin. The property which was claimed by him as a bequest from Galpin had been mortgaged by the latter to the defendant to secure the payment of a sum of money; and these facts appeared upon the petition, to which there was a demurrer. Here then it is clear that an administration was necessary, and that no action could be maintained to recover the property mortgaged until there should have been satisfaction of the debt and an extinguishment of the mortgage. And the court in that case recognize the doctrine that there are cases in which the legatee or heir may maintain an action for the protection and maintenance of his rights respecting personal property. Such we conceive is the present case. About four years had elapsed from the death of the ancestor to the time of the commencement of this suit, during which time the widow, now wife of the defendant, who was the person entitled, had declined to administer. It appears to have been determined between the only parties interested in the estate, the widow and heir, that there being no debts, and hence no creditors to be affected by the proceedings, there was no necessity to incur the trouble and expense of administration, and that the estate should be partitioned amicably, resorting to the probate court to render the distribution legal and effectual. The parties appear to have acted upon this mutual understanding until a controversy arose as to the legal ownership of the property now in suit. The wife of the defendant was entitled to the administration in preference to the heir, and she asserted a claim to the property inconsistent with the interest of the latter. It is not pretended that the estate was indebted, or that administration was necessary for any other purpose than the distribution of the estate between the widow and heir; and between them a controversy had already arisen, from which it was sufficiently apparent that the former was not the proper person to be intrusted with the protection and maintenance of the rights of the latter in respect to this property. [**193**] Under these circumstances we are of opinion that it was

McIntyre v. Chappell.

competent for the plaintiff, as guardian of the infant, to maintain this action. A subsequent grant of administration to the wife cannot, we think, under the circumstances, affect the question. It is unnecessary to enter upon the consideration of the question as to the right of the heir, under other circumstances than the present, to maintain an action to recover the personal property to which he may be entitled by inheritance. The remaining questions presented by the record which it is deemed material to consider relate to—

1st. The instructions to the jury.
2d. The refusing of a new trial.

The instruction objected to as erroneous is that given as an addition or qualification to the first and third instructions asked by the plaintiff; that is, "that if the jury believe that the parties intended to remove to Texas at the time of their marriage, and immediately did remove to Texas, their respective rights must be determined according to the laws of Texas."

Was this instruction, as applied to the facts of this case, correct? The parties had resided in the State of Tennessee up to the time of the marriage. There was no express nuptial contract. Had there been no subsequent change of domicile, the laws of Tennessee would doubtless have governed in respect to the property now in controversy. "Perhaps (says Story) the most simple and satisfactory exposition of the subject, or at least that which best harmonizes with the analogies of the common law, is that in the case of marriage, where there is no special nuptial contract and there has been no change of domicile the law of the place of celebration of the marriage ought to govern the rights of the parties in respect to all personal or movable property wherever acquired and wherever situate." (Story Conf. of L., sec. 159; 5 Mart. N. S., 569.) After examining the adjudged cases and opinion of jurists as to what is the principle to be adopted in cases where there has been a change of domicile, the same [**194**] distinguished jurist says: "Where the place of domicile of both the parties is the same with that of the contract and the celebration of the marriage, no difficulty can arise. The place of celebration is clearly the matrimonial domicile." (Story Conf. L., sec. 192.)

The facts of the present case bring it within the case and principle here stated. But it is insisted that the fact of the intention of the parties to remove to and reside in this State takes this case out of the rule, and that the marital rights of the wife in respect to property acquired before as well as after the actual change of domicile are to be governed by the laws of this State. In support of this proposition, which was in effect asserted in the instruction in question, several authorities have been cited. Those cases which were determined upon express nuptial contracts, not being applicable to the present case, it will not be necessary to notice. But the cases principally relied on by the appellee, and those which seem most to favor the doctrine asserted by the instruction given, are the cases of Le Breton v. Noncher, (3 Mart. R., 60,) and Ford's Curator v. Ford, (2 Mart. R., N. S., 574.) In the former case the parties to the marriage were domiciliated in Louisiana and the female was but thirteen years of age. They ran away and went to Natchez, in Mississippi, without the consent of the parents or guardian of the female, and were there married, and soon after returned to the place of their original domicile in Louisiana, where they resided until the death of the wife. The Supreme Court of Louisiana held that the conjugal rights of the parties were to be governed by the laws of Louisiana. In their opinion the court say: "A party to this marriage was one of those individuals over whom our laws watch with particular care, and whom they have subjected to certain incapacities for their own safety. She was a minor. Has she, by fleeing to another country, removed those incapacities? Her mother is a citizen of this State; she herself was a girl of thirteen years, who had no other domicile than that of her mother. Did she not remain, [**195**] notwithstanding her flight to Natchez, under the authority of this government? Did not the protection of this government follow her

McIntyre v. Chappell.

wherever she went? Again the court say : "The law of nations is law at Natchez as well as at New Orleans. According to the principles of that law, personal incapacities communicated by the laws of any particular place accompany the person wherever he goes. Thus he who is excused the consequences of contracts for want of age in his country cannot make binding contract in another. Therefore, even if this case were pending before a tribunal of the Mississippi territory, it is to be supposed that they would recognize the incapacity under which Alexandrine Dussuau was laboring when she contracted marriage, and decide that such marriage could not have the effect of giving her husband what she was forbidden to give. If that be sound doctrine in any case, how much more so must it be in one of this nature, where the minor, almost a child, has in all probability been seduced into an escape from her mother's dwelling and removed in haste out of her reach."

The brief statement given of the facts in that case, and these extracts from the opinion of the court, will suffice to show that it bears no analogy and admits of no comparison to the present in its facts, and that the grounds and reasons upon which it was decided are wholly inapplicable to the case before us.

In the case of Ford's Curator v. Ford the facts were that the husband resided in Louisiana and the wife in Mississippi previous to the marriage, which took place in the latter State. The property in controversy consisted of slaves which belonged to the wife before marriage, and a portion of which had been hired and taken by the husband to Louisiana before that time. The husband had at the time a furnished house and farm in Louisiana, and had sent to remove his intended wife's property there before the marriage. She had resided with her brother in the State of Mississippi; she left that State for Louisiana the day after the marriage, and had previously expressed [196] her intention to reside permanently in the latter State. The court held that the husband did not by the marriage acquire a right to the slaves of the wife, and that her marital rights were to be determined by the laws of Louisiana.

This case also differs from the present in the material fact that previous to the marriage the domicile of the husband was in Louisiana. There are some general observations in the opinion and reasoning of the court which are supposed to maintain the doctrine contended for in this case, but they must be understood in reference to the facts of the case then present to the mind of the court. And that the fact of the domicile of the husband being in Louisiana materially influenced the decision is evident from the following language of the court : "When the husband and wife have different domiciles, it is to the law of the husband's domicile that the parties ought to be presumed to have submitted ; because the wife, who by her marriage follows the husband's domicile is presumed to have had in view the law of that domicile, which by the marriage is to become hers. The general rule is to attend to the law of the husband's domicile rather than that of the place in which the contract is entered into."

This case, therefore, which goes farther to favor the doctrine contended for than any other which has been cited or with which we are acquainted, is by no means an authority for that doctrine in its application to a case like the present. On the contrary, it is, we think, to be inferred from the language of the court which we have quoted that had the husband been domiciliated in Mississippi at the time of the celebration of the marriage, the decision would have been different. Both parties to the marriage in the present case resided in Tennessee at the time of its celebration. The most that can be said is that they intended to establish their future residence in Texas. To hold that this mere act of volition or intention could change and fix their matrimonial domicile in Texas previous to any act corresponding with that intention, any. actual change of residence, would, it is believed, be going further [197] than courts have ever gone. It would certainly be going very much further than the Supreme Court of Louisiana have gone in the cases we have examined.

Although actual residence is not indispensable to retain a domicile once acquired, but it is retained by the mere intention not to change it or to adopt another, yet the act and the intention must concur to enable a party to acquire

## McIntyre v. Chappell.

a domicile. "Two things," says Story, "must concur to constitute domicile: first, residence; secondly, the intention of making it the home of the party. There must be the fact and the intention; for, as Pothier has truly observed, a person cannot establish a domicile in a place except it be *animo et facto.*" ('Conf. of L., sec. 44.) Again, "The mere intention to acquire a new domicile without the fact of an actual removal, avails nothing." (Id., sec. 47.) And again, "A domicile once acquired remains until a new one is acquired. It is sometimes laid down that a person may be without any domicile; as if he quits a place with an intention to fix in another place, it has been said that while he is *in transitu* he has no domicile. But the more correct principle would seem to be that the original domicile is not gone until a new one has been actually acquired *facto et animo.*" (Ib.; Heirs of Holliman *v.* Peebles, 1 Tex., R., 669.)

The national domicile of these parties was, we think, unquestionably in the State of Tennessee; and we are aware of no principle which, under the circumstances, would justify the conclusion that their matrimonial domicile was elsewhere. The question must be the same, depending for its solution upon the same facts and the same principles of international law, which, to borrow the expression of the Supreme Court of Louisiana in a case cited, is law in Tennessee as well as in Texas, whether to be determined by the courts of that State or this; and there cannot, it is conceived, be a doubt as to how the question must have been decided had it been raised in the courts of the former State.

We conclude that the matrimonial domicile of the parties [198] to this marriage was in the State of Tennessee, and that previous to the acquisition of a domicile *facto et animo* by the husband in this country the laws of that State must furnish the rule of decision as to their marital rights. Their rights as to all property acquired in this country after their removal to it must unquestionably be governed by our laws. (Acts of 1840, 6, sec. 13.) In its application to the facts of this case, we therefore conclude that the instruction in question was erroneous.

The consideration of this question was not, perhaps, absolutely necessary to the disposition of the present case; but it is presented by the record, and is the question which was principally discussed in argument; and as counsel have concurred in expressing a desire that it should be decided, in the belief that its decision may prevent further litigation between the parties and induce a speedy determination of their respective rights, it was deemed proper now to dispose of it.

But the disposition of the case might have been determined by the decision of the remaining question, which is, did the court err in refusing a new trial?

It appears to have been proved conclusively that the negroes in controversy in this suit were either the property of James McIntyre at the time of marriage or were the proceeds of land owned by him previous to that time; that is, they were received in payment of money due upon the sale of the land with the exception of the girl Elvira, which was the child of a woman owned by him previous to the marriage, and the infant child of Eliza. In Louisiana it is held that by the Spanish law, on the dissolution of marriage, everything holden by the husband and wife is presumed to be common property, unless proof be made of its being particular or individual property. (7 Mart. R., 362.) But this presumption may of course be overborne by proof that the fact is otherwise.

The Supreme Court of that State have said that by the [199] Spanish laws everything purchased during the marriage fell into the common stock of gains, and at the death of either of the parties was to be divided equally between the survivor and the heirs of the deceased; and that this effect was produced, whether purchases were with the money or capital of the community or with that of either of the married parties, whether in the name of both or that of one of them separately; but that to this rule there were many exceptions. (1 La. R., 522.) "The rigor of the law (the court say) which declares that property acquired during marriage shall be considered as common to both husband

and wife, although purchased with the separate funds of one of them, is applicable only to acquisitions made by purchase, and does not necessarily include things which may be received by either of them in payment of money due to them on their separate and individual right." (Id., 523.)

If the general rule here stated be conceded, the property acquired in the present case is embraced within the exception. And this accords with the second instruction given to the jury at the instance of the plaintiff. Under the law, as given in charge to the jury by that instruction, (which was, it is conceived, correct,) and the evidence, the plaintiff was entitled to recover; yet the jury returned a verdict for the defendant. The verdict, therefore, was manifestly against law and evidence, and ought to have been set aside and a new trial granted. The instruction did not embrace increase of the slaves owned by James McIntyre previous to the marriage or acquired in his individual right afterwards, but there can be no question that such increase under law must go to the heir, and is not a part of the community. (Acts of 1840, 4, sec. 4; Acts of 1848, 77, sec. 2.)

Judgment reversed.

NOTE 39.—Lacy v. Williams, 8 T., 182; Fisk v. Norvell, 9 T., 13; Finch v. Edmonson, 9 T., 504; Hurt v. Horton, 12 T., 285; Cochran v. Thompson, 18 T., 652; Patton v. Gregory, 21 T., 513; Sanders v. Devereux, 25 T. Supp., 1; Giddings v. Steele, 28 T., 732.

NOTE 40.—Chappell v. McIntyre. 9 T., 161; Hall v. Harris, 11 T., 306; The State v. Barron, 14 T., 179; Keyser v. Pilgrim. 25 T. Supp., 217; Oliver v. Robertson, 41 T., 422.

NOTE 41.—The State v. Barron, 14 T., 179.

NOTE 42.—Love v. Robertson, 7 T., 6; Huston v. Curl, 8 T., 239; Chappell v. McIntyre, 9 T., 161; Rose v. Houston, 11 T., 324; Chapman v. Allen, 15 T., 278; Higgins v. Johnson, 20 T., 389; Dunham v. Chatham, 21 T., 231; Story v. Marshall, 24 T., 305; Smith v. Strahan, 25 T., 103; Mitchell v. Marr, 26 T., 329; Cooke v. Bremond, 27 T., 457; Tucker v. Carr, 39 T., 98; Johnson v. Burford, 39 T., 242; Carr v. Tucker, 42 T., 339.